**BURSOR & FISHER, P.A.**
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Rachel L. Miller (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Facsimile: (305) 676-9006
E-mail: rmiller@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAUREN LUPIA, on behalf of herself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| RECREATIONAL EQUIPMENT, INC., | <u>**JURY TRIAL DEMANDED**</u> |
| Defendant. | |

Plaintiff Lauren Lupia ("Plaintiff") brings this action on behalf of herself, and all others similarly situated against Recreational Equipment, Inc. ("Defendant" or "REI").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action lawsuit on behalf of herself and similarly situated consumers ("Class Members") who purchased Defendant's waterproof apparel (the "Products")[1], which are unfit for their intended use because they contain heightened levels of unsafe fluorine and per- and polyfluoroalkyl substances ("PFAS").  The Products, which are used for protection from rain and wind, are formulated, designed, manufactured, advertised, distributed, and sold by Defendant or its agents to consumers, including Plaintiff, across the United States.

2.      PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[2]

3.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health and how the risks may be underestimated.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[3]

4.      Scientists are also increasingly concerned about how PFAS affect the environment,

---

[1] The Products include REI Co-Op Drypoint GTX Jacket (Women's), REI Co-op Westwinds GTX Jacket (Men's), REI Rainwall Jacket (Kids), and REI Co-op Savanna Trails Pant (Men's).

[2] Nicholas J. Herkert, et. al., Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity, *Environ. Sci. Technol*. 2022, 56, 1162-1173, 1162.

[3] Harvard T.H. Chan Sch. Of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last viewed Mar. 22, 2022).

as PFAS can be found in water, air, fish, and soil, and have been linked to harmful effects in animals as well.[4]

5.      Relevantly, despite Defendant's representations to consumers that its products are "sustainable gear built to last" and "Fair Trade Certified™," independent research conducted by Toxic-Free Future, a nonprofit organization that conducts scientific studies, revealed that the Products contain PFAS, also known as "forever chemicals," that can cause cancer, suppress the immune system and contribute to the contamination of drinking water and wildlife.[5]

6.      Because several of the Products are waterproof jackets meant to resist rain, consumers frequently use the jackets' hoods, which rest directly against the skin, near the nose, mouth, and eyes. As a result, consumers are at a heightened risk of exposure to PFAS through ingestion.

7.      Based on Defendant's representations, a reasonable consumer would expect that the Products can be safely used as marketed and sold.  However, the Products are not safe, posing a significant health risk to unsuspecting consumers.  Yet, neither before or at the time of purchase does Defendant notify consumers like Plaintiff that their Products are unsafe, contain PFAS, or should otherwise be used with caution.

8.      Accordingly, Plaintiff brings her claims against Defendant individually and on behalf of a class of all others similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (2) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; (3) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, *et seq*. and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (5) Fraud; (6) Constructive Fraud; (7) Fraudulent Inducement; (8) Money Had And Received; (9) Fraudulent Omission or Concealment; (10) Fraudulent Misrepresentation; (11) Negligent Misrepresentation; (12) Quasi-Contract / Unjust Enrichment; (13) Breach of Express Warranty; (14) violation of the

---

[4] United States Environmental Protection Agency, "PFAS Explained," https://www.epa.gov/pfas/pfas-explained, (last accessed Apr. 20, 2022).

[5] Erika Schreder, et al. "*Toxic Convenience: The Hidden Costs of Forever Chemicals in Stain- and Water-resistant Products*," January 2022, https://48h57c2l31ua3c3fmq1ne58b-wpengine.netdna-ssl.com/wp-content/uploads/2022/01/toxic-convenience.pdf, at pg. 1.

Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.; and (15) Negligent Failure to Warn.

**PARTIES**

9.      Plaintiff Lauren Lupia is a natural person and a citizen of California who resides in Woodacre, California.  In approximately March 2020, Ms. Lupia purchased Defendant's Product, an REI Co-op Westwinds GTX Jacket, from an REI store in Corte Madera, California.  Prior to her purchase, Ms. Lupia reviewed the labeling, packaging, and marketing materials of her Product, including those set out herein, including that the Product was "sustainable gear built to last" and that the Product was "Fair Trade Certified™," which as discussed below has significant implications for how consumers like Ms. Lupia view such Products.  Thus, Ms. Lupia understood that based on Defendant's claims, the Product was safe for use and a sustainable product that is free of harmful chemicals like PFAS.  Ms. Lupia reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that she would not have purchased the Product, or would not have purchased it on the same terms, if the true facts had been known.  As a direct result of Defendant's material misrepresentations and omissions, Ms. Lupia suffered and continues to suffer, economic injuries.

10.      Ms. Lupia continues to desire to purchase Products from Defendant that are sustainable and safe.  However, concerned about the health and environmental consequences of PFAS, Ms. Lupia is unable to determine if the Product is actually free of harmful chemicals like PFAS.  Ms. Lupia understands that the composition of the Products may change over time.  But as long as Defendant may use the phrases "sustainable gear built to last" and "Fair Trade Certified™" to describe the Products that actually contains heightened levels of fluorine and PFAS, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's Products.

11.      Defendant Recreational Equipment, Inc. is a Washington corporation with its principal place of business located in Sumner, Washington.  Defendant describes itself as a "local outdoor co-op, working to help you experience the power of nature" and "with every purchase you

make with REI, you are choosing to steward the outdoors, support sustainable business and help the fight for life outside."[6]

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A). There are more than 100 Class Members, the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and at least one Class Member is a citizen of a state different than Defendant.

13.     This Court has personal jurisdiction over Defendant because it transacts business in the United States, including in this District, has substantial aggregate contacts with the United States, including in this District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of California, and further, because Plaintiff purchased the Product in this District.

14.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because this District is where a substantial part of the conduct giving rise to Plaintiff's claims occurred, where Defendant transacts business, and where Plaintiff purchased the Products.

## FACTUAL ALLEGATIONS

**A.      PFAS in the Apparel Industry**

15.     PFAS are a category of chemicals which may be used to enhance the performance of textiles and apparel.[7]

16.     PFAS are often divided into two groups: long-chain and short-chain.[8]

---

[6] https://www.rei.com/about-rei
[7] Rachel Cernansky, "Can fashion eliminate 'forever chemicals'?" https://www.voguebusiness.com/sustainability/can-fashion-eliminate-forever-chemicals (last accessed Apr. 20, 2022).
[8] American Water Works Association, "Per- and Polyfluoroalkyl Substance (PFAS) Overview and Prevalence," https://www.awwa.org/Portals/0/AWWA/ETS/Resources/Per-andPolyfluoroalkylSubstances(PFAS)-OverviewandPrevalence.pdf?ver=2019-08-14-090234-873#:~:text=Long%2Dchain%20PFAS%20typically%20are,as%20perfluorobutanoic%20acid%20(PFBA) (last accessed Apr. 20, 2022), pg. 1.

17.     While long-chain PFAS typically contain more than 6 carbons, short-chain PFAS typically are described as those with less than 6 carbons.[9]

18.     Over time, companies have reduced the use of long-chain PFAS as those PFAS have been linked to negative and long-term health consequences.[10]

19.     However, according to the U.S. National Toxicology Program, research suggests that both long-chain and short-chain PFAS have similar levels of toxicity.[11]

20.     PFAS chemical treatments are typically used on textiles in order to make them water repellant and/or stain resistant, waterproof, and breathable.[12]

21.     Despite the threat that PFAS pose to the people and the environment, PFAS continue to be widely used in the apparel industry to the consumers' detriment.[13]

22.     As a result of the controversy surrounding PFAS, many apparel companies have announced the elimination of PFAS from their products' supply chains.[14]

23.     However, the outdoor industry, including companies like REI, largely trail behind customer concerns about the environmental and public health impact of PFAS, despite its representations to the contrary.[15]

24.     Companies continue to use PFAS despite the fact that many companies have found that there are equally effective alternatives to PFAS that do not cause harm to individuals or the environment.[16]

---

[9] *Id*.

[10] *Id*.

[11] Chemical & Engineering News, "Short-chain and long-chain PFAS show similar toxicity, US National Toxicology Program says," https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33 (Last accessed Apr. 20, 2022).

[12] Erika Schreder, et al. "*Toxic Convenience: The Hidden Costs of Forever Chemicals in Stain- and Water-resistant Products*," January 2022, https://48h57c2l31ua3c3fmq1ne58b-wpengine.netdna-ssl.com/wp-content/uploads/2022/01/toxic-convenience.pdf, at pg. 4.

[13] Natural Resources Defense Council, Inc., "Going out of fashion: U.S. apparel manufacturers must eliminate PFAS 'forever chemicals' from their supply chains," https://www.nrdc.org/sites/default/files/pfas_scorecard_r_22-04-b_03_locked.pdf, at pg. 4.

[14] *Id*. at pg. 5.

[15] *Id*.

[16] *Id*. at pg. 6.

25.     Consumers who wear apparel coated with PFAS can be directly exposed to PFAS through numerous means. Children can chew on clothes coated in PFAS and ingest the chemicals, while PFAS-coated clothing can shed PFAS which attach to household dust.[17]

26.     Moreover, some studies suggest that PFAS from clothing can be absorbed by the skin.[18]

27.     In terms of the environmental consequences, PFAS from apparel enter water bodies during manufacturing, during laundering or dry cleaning, and from landfills or incineration.[19]

28.     In fact, studies show that China, Bangladesh, and Vietnam, all countries with high volumes of apparel manufacturing, have waterways highly contaminated with PFAS.[20]

29.     Here in the United States, PFAS from apparel deposited in landfills contaminate approximately 16 billion gallons of water leached from US landfills each year.[21]

30.     REI's home state, Washington, estimates that 2,066 metric tons, or 4.5 million pounds of PFAS in treated textiles are disposed of in landfills in the state every year.[22]

31.     In terms of testing, heightened levels of fluorine are indicative of PFAS.[23]

**B.     Defendant's Sustainability and PFAS Elimination Campaign**

32.     Seeking to address consumer concerns surrounding the use of PFAS in outdoor apparel, REI has placed sustainability at the forefront of its marketing campaign.

33.     On its website, peppered throughout with images of nature, REI claims that it has been "working to help you experience the transformational power of nature" since 1938.  REI further claims that "with every purchase you make with REI, you are choosing to steward the outdoors,

---

[17] *Id.*
[18] *Id.*
[19] *Id.* at pg. 9.
[20] *Id.*
[21] Erika Schreder, et al. "*Toxic Convenience: The Hidden Costs of Forever Chemicals in Stain- and Water-resistant Products,*" January 2022, https://48h57c2l31ua3c3fmq1ne58b-wpengine.netdna-ssl.com/wp-content/uploads/2022/01/toxic-convenience.pdf, at pg. 6.
[22] *Id.*
[23] Leah Segedie, "Report: 65% of Period Underwear Tested Likely Contaminated with PFAS Chemicals," May 24, 2021, https://www.mamavation.com/health/period-underwear-contaminated-pfas-chemicals.html (last accessed April 1, 2022).

support sustainable business and help the fight for life outside."[24]

 

 

34.     REI further claims to offer environmentally-conscious consumers "sustainable gear built to last" through its "product sustainability standards" that "raise[] the bar on Product Sustainability."

# Raising the Bar on Product Sustainability

**REI STAFF  |  APRIL 9, 2018**

At REI, we're working toward a sustainable future, for the planet and communities around the globe.  We're excited to announce the release of the REI Product Sustainability Standards, which will help us raise the bar on product sustainability at REI and across the outdoor industry. It will also make it easier for our members to buy products that support their sustainability values.

///

_____

[24] https://www.rei.com/about-rei.

35.     On its website, REI claims that it is a member of the "Sustainable Apparel Coalition," which helps "retailers and manufacturers to measure their environmental and social impacts at each stage of the value chain."[25]

# What we offer

## Sustainable gear built to last.

We don't just love and sell high-quality outdoor gear and apparel. We also design and develop our own: REI Co-op and Co-op Cycles. Our teams get outside with members in the dirt, wind and rain to put our designs to the test. That way our products work for you and can be passed down a generation—or two.

We put sustainability at the center of how we make products. In 2018, we debuted comprehensive product sustainability standards that apply to every brand we sell. Working closely with our partners at home and abroad allows us to make a larger impact across the outdoor industry. From seeking better ways of making goods, to advancing fair trade manufacturing practices, to putting our profits to good use, we advocate for the places we all love and make it easier for customers to shop their values.

36.     Specifically, regarding the use of PFAS in its Products, REI touts that it has "eliminated long-chain PFAS" from its waterproof REI Co-op brand.

- **Durable Water Repellents (DWR):** Concerns about the toxicity and environmental persistence of certain durable water repellents is driving a transition in the industry. REI has eliminated long-chain PFAS DWR treatments from the REI Co-op brand. We use short-chain PFAS treatments where viable alternatives do not yet exist, and we continue to expand the use of non-fluorinated options.

37.     REI also touts the Product as "made in a Fair Trade Certified™ factory" both on the Product itself and directly on its website.

38.     This is significant.   According to the Fair Trade Certified, "U.S. Consumers increasingly know and trust Fair Trade Certified™."

39.     Specifically, Fair Trade Certified notes that "Consumers say verified statements of a brand's impact builds trust" and "Fair Trade USA's rigorously maintained standards set the global benchmark for sustainable sourcing, strengthens brand trust, and builds consumer loyalty."

---

[25] https://www.rei.com/stewardship/sustainable-product-practices.

40.     Fair Trade Certified also notes that "We are the most widely recognized fair trade seal in the United States."

41.     Fair Trade Certified states that "Working with Fair Trade USA® makes you a partner in . . . taking steps to protect the planet."[26]

42.     The Organization states that "66% of consumers recognize the Fair Trade Certified Seal"; that "78% of consumers put their trust in the Fair Trade Certified Seal," and that "1 in 3 consumers are more likely to buy a product that carries the Fair Trade Certified seal."[27]

43.     As an example of the impact this has on REI's pricing of the Product, Fair Trade Certified claims that "55% of Millennials indicated they'll pay a premium for Fair Trade Certified products."[28]

44.     Indeed, REI recognizes the importance of the seal, noting directly on its website that "[b]y considering the following sustainability attributes when you shop, you can make a positive impact on the planet."[29]  REI then proceeds to list Fair Trade as one such attribute.

45.     Prior to her purchase, Plaintiff saw these and like representations, and believed that the Products were safe for use and were otherwise sustainable.  As a result, Plaintiff relied on these and like representations in purchasing the Products.  However, as described in the next section, Defendant's Products are not safe for use or sustainable, and pose a critical risk to the safety and health of consumers and the environment.

**C.     Defendant's Products Contain Harmful PFAS**

46.     Recognizing the concerns about the potential for PFAS in waterproof apparel, Toxic-Free Future, a nonprofit organization that conducts scientific studies on toxic chemicals, in conjunction with independent laboratories, tested 20 different outdoor apparel items for fluorine.[30]

---

[26] https://www.fairtradecertified.org/business
[27] https://www.fairtradecertified.org/business/consumer-insights.
[28] *Id.*
[29] https://www.rei.com/learn/expert-advice/sustainable-clothing-and-gear.html.
[30] Erika Schreder, et al. "*Toxic Convenience: The Hidden Costs of Forever Chemicals in Stain- and Water-resistant Products*," January 2022, https://48h57c2l31ua3c3fmq1ne58b-wpengine.netdna-ssl.com/wp-content/uploads/2022/01/toxic-convenience.pdf, at pg. 1.

47.     As fluorine may indicate the presence of PFAS,[31] Toxic-Free Future then commissioned PFAS testing of items with fluorine levels in excess of the 100 parts-per-million screening threshold.[32]

48.     Of the sixty total items tested for fluorine, 35 of the items contained fluorine at levels above 100 parts-per-million,[33] a level widely recognized as indicating intentional use.[34]

49.     Of the 20 outdoor apparel items found to contain fluorine in excess of 100 parts-per-million, PFAS were detected in 15, including different types of REI Jackets and Pants (the Products at issue).[35]

50.     Toxic-Free Future also found that three of the REI Jackets contained a mixture of long-chain and short-chain PFAS.[36]

51.     While PFAS were found in all of the REI Jackets tested by Toxic-Free Future, REI's Co-op Westwinds GTX Jacket had the highest level of long-chain and short-chain PFAS, which combined for a total PFAS-level in excess of 1000 parts-per-billion.[37]

52.     Worse, as the following chart demonstrates, the level of PFAS compounds in REI's Products are significantly higher than competitors:

///

///

---

[31] Supply Chain Solutions Center, "Testing for PFAS in food packaging," https://supplychain.edf.org/resources/testing-for-pfas-in-food-packaging/#:~:text=The%20total%20fluorine%20method%20provides,certification%20program%20for%20fiber%20products. (last accessed Apr. 20, 2022).

[32] Schreder, "*Toxic Convenience: The Hidden Costs of Forever Chemicals in Stain- and Water-resistant Products*," January 2022, https://48h57c2l31ua3c3fmq1ne58b-wpengine.netdna-ssl.com/wp-content/uploads/2022/01/toxic-convenience.pdf, at pgs. 1, 7.

[33] *Id.* at pg. 8.

[34] For example, the Bridgeable Products Institute ("BPI") has adopted 100ppm as a threshold. Likewise, the Supply chain Solutions Center notes that is "recommends that companies systemically screen [their products] using a total fluorine method and investigate levels over 100 [ppm], which indicates intentional use." *See* https://supplychain.edf.org/resources/testing-for-pfas-in-food-packaging/?msclkid=4029f052c27111eca3f401c1faa5544f (last accessed Apr. 22, 2022).

[35] *Id.* at pgs. 12-13.

[36] *Id.* at pg. 9.

[37] *Id.* at pg. 12.

---



53.     Toxic-Free Future further explained the significance of these findings, noting that "In 2020, U.S. Food and Drug Administration (FDA) scientists reviewed the toxicity of 6:2 FTOH. They described evidence from laboratory studies that 6:2 FTOH exposure results in effects including kidney and liver degeneration; impacts on thymus and spleen, key immune system organs; developmental effects including decreased survival of young and reduced growth lactation; and indications of possible carcinogenicity."

54.     Toxic-Free Future also described the significance of 8:2 FTOH, stating that "Its abundance indicates that many textile manufacturers have continued to rely on older PFAS banned in other countries and phased out by U.S. manufacturers. As a result, U.S. residents have continued exposure to 8:2 FTOH and its breakdown products, which include PFOA and PFNA. These compounds are well-established as toxic and bioaccumulative, with estimated half-lives in people of two to 10 years for PFOA and 2.5 to 4.3 years for PFNA. Potential toxic effects of PFOA include harm to the immune system, increased cholesterol, and cancer; and for PFNA, they include increased cholesterol and decreased antibody response to vaccines.

55.     The following table also reveals the type of PFAS in REI's Products, generally categorized as "older PFAS detected" denoted by a red circle and "newer PFAS detected" indicated by an orange triangle:

///

///

| | | |
|---|---|---|
| REI co-op | Columbia Rainy Trails Fleece Lined Jacket, Girls' | ▲ |
| REI co-op | Mammut Kento HS Hooded Jacket, Men's | |
| REI co-op | Patagonia Torrentshell Jacket, Women's | ▲ |
| REI co-op | REI Co-op Drypoint GTX Jacket, Men's | ◉ ▲ |
| REI co-op | REI Co-op Westwinds GTX Jacket, Women's | ◉ ▲ |
| REI co-op | REI Rainwall Jacket, Kids | ◉ ▲ |
| REI co-op | REI Co-op Sahara Convertible Pant, Women's | |
| REI co-op | REI Co-op Savanna Trails Pant, Men's | ▲ |

56.     Thus, contrary to the express representations made on REI's website that it "has eliminated long-chain PFAS," the use of long-chain PFAS continues to be prevalent in its Co-Op line of Products.[38]

57.     Defendant, as a manufacturer and marketer of outdoor apparel that is known to use PFAS treatment on its apparel to make those products waterproof, knew or should have known about the presence of such PFAS in its Products.

58.     Yet, Defendant chose not to disclose the PFAS-content of its Products, and instead concealed this information from environmentally and health-conscious consumers, to increase revenues by the cost savings associated with the use of these chemicals.

59.     This has not been without consequences for consumers because as noted, PFAS are particularly problematic to human health and the environment because they resist degradation in the environment and can remain in the body for years after exposure.[39]

---

[38] https://www.rei.com/stewardship/sustainable-product-practices.
[39] Leah Segedie, "Report: 65% of Period Underwear Tested Likely Contaminated with PFAS Chemicals," May 24, 2021, https://www.mamavation.com/health/period-underwear-contaminated-pfas-chemicals.html (last accessed April 1, 2022).

60.     Researchers are concerned about dermal contact with PFAS because such exposure poses the same health hazards as ingesting the compound in water or food[40] and PFAS are not quickly excreted from the body like other hormone-disrupting chemicals.[41]

61.     PFAS are also known to migrate during laundering, meaning that clothing items which are treated with PFAS with chemicals onto the other clothing and into waterways.[42]

62.     Moreover, according to the Technical University of Munich, "Fluorine is the most reactive chemical element and highly toxic."[43]

63.     Live Science confirms this, noting that "[w]hile small amounts of fluorine are essential for maintaining the strength of our bones and teeth, too much can have the reverse effect of causing osteoporosis or tooth decay, as well as potentially harming the kidneys, nerves, and muscles."[44]

64.     And Science Notes describes the effects of fluorine in more detail, stating that they are "comparable to those of pure chlorine, irritating eyes and mucous membranes and damaging the liver and kidneys."[45]

65.     A report published in Toxicology Mechanisms and Methods also notes that "[d]ue to its insatiable appetite for calcium, fluorine . . . likely represents a form of chemistry that is incompatible with biological tissues and organ system functions.  Based on an analysis of the effects

---

[40] Ketura Persellin, "Study: PFAS Exposure Through Skin Causes Harm Similar to Ingestion," Environmental Working Group (Jan. 13, 2020), https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion (last accessed April 6, 2022).
[41] *Id.*
[42] Ministry of Environment and Food, The Danish Environmental Protection Agency, "Polyfluoroalkyl sub-stances (PFASs) in Textiles for Children," 2015, https://www2.mst.dk/Udgiv/publications/2015/04/978-87-93352-12-4.pdf  (last accessed April 1, 2022).
[43] Technical University of Munich (TUM). "Fluorine: Toxic and aggressive, but widely used: Investigations with neutrons settle scientific dispute about the structure of solid fluorine." ScienceDaily. ScienceDaily, 27 March 2019. www.sciencedaily.com/releases/2019/03/190327112637.htm (last visited Apr. 6, 2022).
[44] Rachel Ross, "Facts About Fluorine," *Live Science* (Aug. 21, 2018), https://www.livescience.com/28779-fluorine.html (last visited Apr. 6, 2022).
[45] Ann Hemenstine, "What Is Fluoride?  Fluoride vs. Fluorine" *Science Notes* (Sept. 30, 2021), https://sciencenotes.org/what-is-fluoride-fluoride-vs-fluorine/ (last visited Apr. 6, 2022).

of fluorine demonstrated consistently in the literature, safe levels have not been determined nor standardized" but that "the National Research Counsel (NRC), offer[s] strong support for an immediate reconsideration concerning risk vs benefit."[46]

66.     But this is not the only concern.  The dangers in the presence of fluorine does not end there as fluorine indicates the existence of PFAS and it is beyond dispute that PFAS are harmful to the human body.  In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[47]

67.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[48]



---

[46] Jeff Prystupa, "Fluorine – A Current Literature review.  An NRC and ATSDR based review of safety standards for exposure to fluorine and fluorides," *Toxicology Mechanisms and Methods*, Vol. 21, Iss. 2 (2011), https://www.tandfonline.com/doi/abs/10.3109/15376516.2010.542931 (last visited Apr. 6, 2022).
[47] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last accessed Mar. 22, 2022).
[48] European Environment Agency, "Emerging Chemical Risks in Europe – 'PFAS'" (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemicals-risks-in-europe (last accessed Mar. 22, 2022).

68.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[49]

69.     In total, this research demonstrates that the risk of severe health complications arising from exposure to PFAS is both credible and substantial.

70.     As noted, the harmful risks also extend to the environment where, once introduced, they quickly spread around the globe through multiple pathways, as demonstrate by the figure below.[50]



71.     Once introduced, PFAS cause many of the same problems for other animals as they do for humans, including harm to the immune system, kidney and liver function of several animals from dolphins to sea otters to polar bears, often making their way to dinner tables of people who did not even purchase the Product.[51]

///

---

[49] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS" https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed Mar. 22, 2022).
[50] PFAS Free, "What are PFAS?" https://www.pfasfree.org.uk/about-pfas (last accessed Apr. 1, 2022).
[51] *Id.*

### D. Defendant's Misrepresentations and Omissions Are Actionable

72. Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as "sustainable gear built to last" and "Fair Trade Certified™," despite having characteristics that detract from the safety and sustainability of the Products.

73. Plaintiff and Class Members bargained for apparel items that are safe and sustainable, and were deprived of the basis of their bargain when Defendant sold them a product containing fluorine and PFAS, dangerous substances with well-known health and environmental consequences.

74. No reasonable consumer would expect that a product marketed as "sustainable gear built to last" and "Fair Trade Certified™" would pose a risk to their health, safety, and wellbeing, or that it may contain dangerous levels of fluorine and PFAS, which are indisputably linked to harmful health effects in humans. Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Products.

75. As the Products expose consumers to PFAS and that such exposure poses a risk to consumers' health, the Products are not fit for use by humans. Plaintiff and the Class are further entitled to damages for the injury sustained in the exposure to PFAS, damages related to Defendant's conduct, and injunctive relief.

76. Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiff and Class members the true standard, quality, and grade of the Products and to disclose that the Products may contain substances known to have adverse health and environmental effects. Nonetheless, Defendant concealed and affirmatively misrepresented the Products, as discussed herein.

77. Although Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, and the knowledge that Defendants had regarding the presence of fluorine and PFAS and their failure to disclose the existence of these in the Products to consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

78.     WHO:  Defendant made material misrepresentations and/or omissions of fact about the Products through their labeling, website representations, and marketing statements, which include the statement that the Products are "sustainable gear built to last" and "Fair Trade Certified™." These representations also constitute omitted material information regarding harmful chemicals in the Products.

79.     WHAT:  Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contain fluorine and PFAS, which are widely known to have significant health and environmental repercussions.  Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products are safe and sustainable, when they are not. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet they continued to pervasively market the Products in this manner.

80.     WHEN:  Defendant made material misrepresentations and/or omissions during the putative Class periods, including prior to and at the time Plaintiff and Class Members purchased the Products, despite its knowledge that the Products may contain harmful substances.

81.     WHERE:  Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Products' packaging, website, and through marketing materials.

82.     HOW:  Defendant made material misrepresentations and/or failed to disclose material facts regarding the Products, including the presence of fluorine and PFAS.

83.     WHY:  Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to tens of thousands of consumers.

84.     INJURY:  Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

## **TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS**

85.     Defendant would have had actual knowledge for years that the Products contain harmful chemicals such as fluorine and PFAS.

86.     Although Defendant was aware of the deception in its labeling given the inclusion of fluorine and  PFAS in the Products despite claims of the Products' safety and sustainability, they took no steps to warn Plaintiff or Class Members of risks related to fluorine and PFAS in the Products.

87.     Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Products.  Defendant had a duty to disclose the true nature and quality of the Products and to disclose the health and safety risks associated with the Products.

88.     Defendant made, and continue to make, affirmative misrepresentations to consumers, to promote sales of the Products, including that the Products are safe and sustainable.

89.     Defendant concealed material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Products.   Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members.   Accordingly, Plaintiff and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

90.     The fluorine and PFAS included in the formulation, design and/or manufacture of the Products were not reasonably detectible to Plaintiff and Class Members.

91.     At all times, Defendant actively and intentionally concealed the existence of the fluorine and PFAS and failed to inform Plaintiff or Class Members of this risk.  Accordingly, Plaintiff and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

92.     Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Products contained harmful chemicals such as fluorine and PFAS.

93.     Defendant concealed or misrepresented this information for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

94.     As a result of Defendant's active concealment of the fluorine and PFAS and/or failure

to inform Plaintiff and Class Members of the fluorine and PFAS, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from relying on any statute of limitations in light of its active concealment of the potentially harmful nature of the Products.

95.     Further, the causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that the Products contained fluorine and PFAS, which, at the very earliest, would have been in January 2022. Plaintiff and Class Members had no realistic ability to discern that the Product contained PFAS until after the Toxic-Free Future study. Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence of fluorine and PFAS in the Products and of the Products' true nature.

## CLASS ALLEGATIONS

96.     Plaintiff brings this nationwide class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in the United States who purchased the Product (the "Class"). Excluded from the Class are persons who made such purchases for purposes of resale.

97.     Plaintiff Lupia also seeks to represent a subclass of all Class Members who purchased the Product in the State of California (the "California Subclass"). Excluded from the California Subclass are persons who made such purchases for purpose of resale.

98.     As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

99.     At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" or "Subclass Members"). However, given the nature of the claims and the number of retail stores in the United States selling Defendant's Product, Plaintiff believes that Class and Subclass Members are so numerous that joinder of all members is impracticable.

100.   There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and facts common to members of the Class predominate over questions that may affect individual Class Members include:

(a)   whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

(b)   whether Defendant's conduct was unfair and/or deceptive;

(c)   whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class;

(d)   whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

101.   With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated the California Consumers Legal Remedies Act as well as the California Unfair Competition Law.

102.   Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased, in a typical consumer setting, Defendant's Products, and Plaintiff sustained damages from Defendant's wrongful conduct.

103.   Plaintiff is an adequate representative of the Class and Subclasses because her interests do not conflict with the interests of the Class Members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiff and her counsel.

104.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and

factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

### COUNT I
### (Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.)

105.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

106.    Plaintiff Lupia brings this claim individually and on behalf of the proposed California Subclass against Defendant.

107.    California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

108.    By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

109.    Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

110.    As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers.  In addition, Defendant has committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

111.    Plaintiff Lupia and members of the California Subclass reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

112.    Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

113.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

114.    Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendant's claims, nondisclosures and misleading statements with respect to the Products, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

115.    Plaintiff Lupia and the other California Subclass Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

116.    There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Products.

117.    Plaintiff Lupia and the other California Subclass Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

118.    The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends

established public policy, or is substantially injurious to Plaintiff Lupia and the other California Subclass Members.

119.    Pursuant to California Business and Professional Code § 17203, Plaintiff Lupia and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff Lupia and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff and the California Subclass' attorneys' fees and costs.

### COUNT II
**(Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*)**

120.    Plaintiff Lupia realleges and reincorporates by reference all paragraphs alleged above.

121.    Plaintiff Lupia brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

122.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

123.    Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

124.    Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

125.    Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as "sustainable gear built to last" and "Fair Trade Certified™" when in fact the Products contain fluorine and PFAS.

126.    Defendant's representations are wrong as the Products contain heightened levels of fluorine and PFAS and thus, cannot properly be marketed as "sustainable gear built to last" and "Fair

Trade Certified™" because the chemicals they contain subject unsuspecting consumers to significant health and environmental risks.

127.    Defendant has exclusive knowledge of the Products' composition, which was not known to Plaintiff or California Subclass Members.

128.    Defendant made partial representations to Plaintiff Lupia and California Subclass Members, while suppressing the true nature of the Products.  Specifically, by displaying the Products and describing the Products as safe and sustainable, including on the product packaging, on its website, and in its marketing, without disclosing that the Products were unsafe and detrimental to human health and the environment.  As described above, Defendant has knowledge of PFAS treatment to its outdoor apparel Products and yet has continued to produce the Products with PFAS. Moreover, Defendant affirmatively misrepresented the Products despite its knowledge that the Products were not as advertised.

129.    Plaintiff Lupia and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

130.    On March 9, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a). The letter was sent via certified mail, return receipt requested, advising Defendant that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendant did not respond to the letter.

131.    Accordingly, Plaintiff Lupia and the California Subclass Members seek all relief available under the CLRA, including restitution, damages, injunctive relief, the payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court.

///

///

## COUNT III

**(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq*. and California Commercial Code § 2314)**

132.   Plaintiff Lupia realleges and reincorporates by reference all paragraphs alleged above.

133.   Plaintiff Lupia brings this claim individually and on behalf of all members of the California Subclasses.

134.   Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

135.   The Products at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

136.   Plaintiff Lupia and the Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

137.   Defendant is in the business of manufacturing, assembling, and/or producing the Products and/or selling the Products to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

138.   Defendant impliedly warranted to retailer buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used.  For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements.  Defendant breached these implied warranties because the Products were unsafe for use.  Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

139.    Plaintiff and California Subclass Members purchased the Product in reliance upon Defendant's skill and judgment in properly packaging and labeling the Product.

140.    The Products were not altered by Plaintiff or the California Subclass Members.

141.    The Products were defective at the time of sale when they it the exclusive control of Defendant.  The issue as described in this complaint was latent in the product and not discoverable at the time of sale.

142.    Defendant knew that the Products would be purchased and used without additional testing by Plaintiff and Class Members.

143.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Product, namely, that they were unfit for use and posed a significant safety risk.

144.    Plaintiff and the California Subclass seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## COUNT IV
### (Violation of California's False Advertising Law,
### Cal. Bus. & Prof. Code § 17500, *et seq*.)

145.    Plaintiff Lupia individually and on behalf of the California Subclass incorporates by this reference all allegations contained in the preceding paragraphs as if fully set forth herein.

146.    Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive class members and the public.  As described above, and throughout this Complaint, Defendant misrepresented the Products as "sustainable gear built to last" and "Fair Trade Certified™" when, in fact, the Products contain fluorine and PFAS.

147.    By its actions, Defendant disseminated uniform advertising regarding the Products to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

148.    The above-described false, misleading, and deceptive advertising Defendant

disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Products contain substances that pose a significant risk to the health, wellbeing, and environment of Plaintiff and the Subclass Members.

149.    Defendant continued to misrepresent to consumers that the Products are "sustainable gear built to last" and "Fair Trade Certified™."  However, as described, Defendant has abused the trust of consumers through these representations.

150.    In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff and other class members based their purchasing decisions on Defendant's omitted material facts.  The revenue attributable to the Products sold in those false and misleading advertisements likely amounts to tens of millions of dollars.  Plaintiff and Class members were injured in fact and lost money and property as a result.

151.    The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

152.    As a result of Defendant's wrongful conduct, Plaintiff and the class members lost money in an amount to be proven at trial.  Plaintiff and the class members are therefore entitled to restitution as appropriate for this cause of action.

153.    Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

**COUNT V**
**(Fraud)**

154.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

155.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of California.

156.    At the time Plaintiff and Class members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as "sustainable gear built to least" and "Fair Trade Certified™" despite containing fluorine and PFAS.

157.    Defendant affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed sustainable and safe for use.

158.    Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

159.    Plaintiff and Class members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

160.    Plaintiff and Class members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

161.    Plaintiff and Class members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Product. Plaintiff and Class members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiff and Class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT VI
### (Constructive Fraud)

162.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

163.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of California.

164.    At the time Plaintiff and Class members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

165.   Defendant affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed safe for use and sustainable.

166.   Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

167.   Defendant had an obligation not to omit or misrepresent the Products because in addition to the fact that the Products pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Products; (c) Plaintiff and class members relied upon Defendant to make full disclosures based upon the relationship between Plaintiff and class members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

168.   Plaintiff and Class and Subclass members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

169.   Plaintiff and class members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

170.   Plaintiff and class members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Products, and what information was available regarding the Products.

171.   Defendant breached its duty to Plaintiff and class members to make full disclosures of the safety of its Products.

172.   Plaintiff and class members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, thus causing Plaintiff and class members to sustain actual losses and damages in a sum to be determined at trial.

///

///

1

## COUNT VII
**(Fraudulent Inducement)**

2

3

173.    Plaintiff incorporates by this reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

4

5

174.    Plaintiff brings this claim individually and on behalf of the Class under the laws of

the State of California.

6

7

175.    Defendant did not disclose, but instead concealed and misrepresented, the Product as

discussed herein.

8

9

176.    Defendant knew, or should have known, that the Products were falsely portrayed and

10

that knowledge of the safety-related issues discussed throughout was withheld from the consumer

public.

11

12

177.    Defendant also knew that its omissions and misrepresentations regarding the Products

were material, and that a reasonable consumer would rely on Defendant's representations (and

13

corresponding omissions) in making purchasing decision.

14

15

178.    Plaintiff and Class members did not know—nor could they have known through

reasonable diligence—about the true quality of the Products.

16

17

179.    Plaintiff and class members would have been reasonable in relying on Defendant's

misrepresentations (and corresponding omissions) in making their purchasing decisions.

18

19

180.    Plaintiff and class members had a right to rely on Defendant's representations (and

corresponding omissions) as Defendant maintained a monopolistic control over the Products, and

20

what information was available regarding the Products.

21

22

181.    Defendant intended to induce—and did, indeed, induce—Plaintiff and class members

into purchasing the Products based upon their affirmative representations and omissions.

23

24

182.    Plaintiff and class members sustained damages as a result of their reliance on

Defendant's omission and misrepresentations, thus causing Plaintiff and class members to sustain

25

actual losses and damages in a sum to be determined at trial.

26

///

27

///

28

## COUNT VIII
### (Money Had and Received)

183.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

184.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of California.

185.    As a result of the Plaintiff's and Class Members' purchase of the Products, Defendant obtained money for its own use and benefit, and, as a result of its breaches of contract and breaches of the covenant of good faith and fair dealing implied in those agreements, became indebted to the Plaintiff and class members in an amount to be determined at trial.

186.    No part of any of the monies due and owing to Plaintiff and class members has been repaid, although Plaintiff and class members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

## COUNT IX
### (Fraudulent Concealment or Omission)

187.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

188.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of California.

189.    At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Products.

190.    Defendant, acting through its representatives or agents, delivered the Products to its own distributors and various other distribution channels.

191.    Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Products as discussed throughout.

192.    Rather than inform consumers of the truth regarding the Products, Defendant misrepresented the quality of the Products as discussed herein at the time of purchase.

193.    Defendant made these material misrepresentations to boost or maintain sales of the

Products, and in order to falsely assure purchasers of the Product that Defendant is a reputable company and that its Products are safe for use and sustainable.  The false representations were material to consumers because the representations played a significant role in the value of the Products purchased.

194.     Plaintiff and class members accepted the terms of use, which were silent on the true nature of the Products, as discussed throughout.  Plaintiff and class members had no way of knowing that Defendant's misrepresentations as to the Products, and had no way of knowing that Defendant's misrepresentations were misleading.

195.     Although Defendant had a duty to ensure the accuracy of the information regarding the Product, it did not fulfill these duties.

196.     Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales of the Products were essential for its continued growth and to maintain and grow their reputation as a premier designer and vendor of the Products.  Such benefits came at the expense of Plaintiff and Class Members.

197.     Plaintiff and Class Members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiff's and class members' actions were justified given Defendant's misrepresentations.  Defendant was in the exclusive control of material facts, and such facts were not known to the public.

198.     Due to Defendant's misrepresentations, Plaintiff and Class Members sustained injury due to the purchase of the Product that did not live up to their advertised representations.  Plaintiff and class members are entitled to recover full refunds for the Products they purchased due to Defendant's misrepresentations.

199.     Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff, and Class Members' rights and well-being, and in part to enrich itself at the expense of consumers.  Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products.

Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT X**
**(Fraudulent Misrepresentation)**

200.     Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

201.     Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of California.

202.     Defendant falsely represented to Plaintiff and the Class that the Products were "sustainable gear built to last" and "Fair Trade Certified™."

203.     Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase the Products.

204.     Defendant knew or should have known that their representations about the Products were false in that the Products are not safe for use or sustainable as discussed throughout.  Defendant knowingly allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

205.     Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Products to their detriment.  Given the deceptive manner in which Defendant advertised, marketed, represented, and otherwise promoted the Products, Plaintiff's and the Classes' reliance on Defendant's misrepresentations was justifiable.

206.     As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Products at all had they known of the safety risks associated with the Products and that it does not conform to the Products' labels, packaging, advertising, and statements.

207.     Plaintiff and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

///

## COUNT XI
### (Negligent Misrepresentation)

208.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

209.    Plaintiff brings this claim individually on behalf of the Class under the laws of the State of California.

210.    Defendant had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

211.    Defendant breached their duty to Plaintiff and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Product to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action.

212.    Defendant knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for their intended use and were otherwise not as warranted and represented by Defendant.  Specifically, Defendant knew or should have known that the Products were not safe for use or sustainable.

213.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Products at all had they known that the Products were not safe for use and that the Products do not conform to the Products' labeling, packaging, advertising, and statements.  Plaintiff and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

## COUNT XII
### (Quasi-Contract / Unjust Enrichment)

214.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

215.    Plaintiff brings this claim individually and on behalf of Members of the Nationwide Class under the laws of the State of California.

216.    To the extent required by law, this cause of action is alleged in the alternative to legal

claims, as permitted under Fed. R. Civ. P. 8.

217.    Plaintiff and Class Members conferred benefits on Defendant by purchasing the Products.

218.    Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Products were unfit for their intended purpose as it was unsafe for use.  These omissions caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts were known.

219.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## COUNT XIII
### (Breach of Express Warranty)

220.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

221.    Plaintiff brings this claim individually and on behalf of Members of the Nationwide Class under the laws of the State of California.

222.    Plaintiff and Class Members formed a contract with Defendant at the time Plaintiff and Class Members purchased the Products.

223.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Products packaging and through marketing and advertising, as described above.

224.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and Class Members.

225.    As set forth above, Defendant purports through their advertising, labeling, marketing, and packaging, to create an express warranty that the Products are safe for its intended use and sustainable.

226.    Plaintiff and Class Members performed all conditions precedent to Defendant's

liability under this contract when they purchased the Products.

227.    Defendant breached express warranties about the Products and their qualities because despite Defendant's warranties that the Products are "sustainable gear built to last" and "Fair Trade Certified™" the Products contain fluorine and PFAS, which are harmful to human health and the environment.  Thus, the Products did not confirm to Defendant's affirmations and promises described above.

228.    Plaintiff and each Class Member would not have purchased the Products had they known the true nature of the Products.

229.    As a result of Defendant's breach of warranty, Plaintiff and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

230.    Plaintiff, through counsel, sent Defendant a letter via certified mail return receipt requested, apprising Defendant of its breach of warranties in accordance with U.C.C. §§ 2-313, 2-314, and 2-607.  Defendant did not respond.

**COUNT XIV**
**(Violation Of The Magnuson-Moss Warranty Act,**
**15 U.S.C. §§ 2301, *et seq*.)**

231.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

232.    Plaintiff brings this claim individually and on behalf of the members of the Class under the laws of the State of California.

233.    The Products are a consumer product as defined in 15 U.S.C. § 2301(1).

234.    Plaintiff and Class Members are consumers as defined in 15 U.S.C. § 2301(3).

235.    Defendant is a supplier and warrantor as defined in 15 U.S.C § 2301(4) and (5).

236.    In connection with the marketing and sale of the Products, Defendant impliedly warranted that the Product was fit for use and expressly warranted that the Product was "sustainable gear built to last."  However, as described throughout, it is not true.

237.    By reason of Defendant's breach of warranties, Defendant violated the statutory rights due to Plaintiff and the Class pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C §§ 2301, *et*

*seq.*, thereby damaging Plaintiff and the Class.

238.    On March 9, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a pre-suit notice letter, apprising Defendant of its breach of warranties.  The letter was sent via certified mail, return receipt requested.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendant did not respond.

239.    Plaintiff and the Class Members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Products if they knew the truth about the Products.

### COUNT XV
**(Negligent Failure to Warn)**

240.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

241.    Plaintiff brings this claim individually and on behalf of members of the Class under the laws of the State of California.

242.    At all relevant times, Defendant was responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Products. At all relevant times, it was reasonably foreseeable by Defendant that the use of the Products in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Products.

243.    At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Products posed to Plaintiff and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

244.    Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Products, had a duty to warn Plaintiff and the Class of all dangers associated with the intended use of the Products.

245.    At minimum, the duty arose for Defendant to warn consumers that use of the Products could result in injury and was unreasonably dangerous.

246.    Defendant was negligent and breached its duty of care by negligently failing to provide warnings to purchasers and users of the Products, including Plaintiff and the Class, regarding the true nature of the Products, its risks, and potential dangers.

247.    Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Products contain ingredients known to cause adverse health effects in humans.

248.    Defendant knew, or through the exercise of reasonable care, should have known of the inherent Defect and resulting dangers associated with using the Products as described herein, and knew that Plaintiff and Class Members could not reasonably be aware of those risks. Defendant failed to exercise reasonable care in providing Plaintiff and the Class with adequate warnings.

249.    As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of the Products, including its intended use, could cause and has caused injuries and other damages, Plaintiff and the Class have suffered damages, as described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

A.    For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Class and the Subclass and Plaintiff's attorneys as Class Counsel;

B.    For an order declaring the Defendant's conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiff, the nationwide Class, and the California and Subclasses on all counts asserted herein;

D.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable monetary relief;

G.    For injunctive relief as pleaded or as the Court may deem proper;

H.      For an order awarding Plaintiff and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit; and

I.      For medical monitoring as a means to safeguard Plaintiff's and Class Members' health and to mitigate any damages for future medical treatment.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  April 25, 2022             Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Sean L. Litteral*
           Sean L. Litteral

Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: slitteral@bursor.com

Rachel L. Miller (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Facsimile: (305) 676-9006
E-mail: rmiller@bursor.com

*Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Sean L. Litteral, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am an associate at Bursor & Fisher, P.A., and counsel of record for Plaintiff Lauren Lupia, who resides in Woodacre, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California.   Additionally, Defendant transacts substantial business in this District, including the purchases and Products at issue, and Defendant advertised and marketed the Products at issue to Plaintiff in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California, this 25th day of April, 2022.

         _/s/ Sean L. Litteral_____
          Sean L. Litteral